**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JUSTIN RITTACCO,

Plaintiff,

v.

KRISTEN ZELECHOWSKI,

Defendant.

)
)
)
)
)
)
)
)
)
)

Civil Action No. 22-544
Judge Nora Barry Fischer

**MEMORANDUM OPINION**

## I.    INTRODUCTION

Plaintiff Justin Rittacco ("Rittacco" or "Plaintiff") sued Defendant Kristen Zelechowski, ("Zelechowski" or "Defendant"), a state trooper, under 42 U.S.C. § 1983 for violating his Fourth Amendment rights to be free from malicious prosecution, false arrest, and false imprisonment after he was acquitted by a Fayette County jury of criminal homicide, simple assault, making terroristic threats, and reckless endangerment.  (Docket No. 1).  Presently before the Court is a contested motion for summary judgment filed by Defendant, which has been fully briefed.  (Docket Nos. 41–46, 52–56, 58).  Defendant invokes qualified immunity and derivative prosecutorial immunity and argues, alternatively, that Plaintiff failed to present sufficient evidence to support the elements of his claims.  (Docket No. 42).  Plaintiff naturally opposes.  (Docket No. 55).  Neither party requested argument and the motion is now ripe for disposition.

After carefully considering the parties' positions and for the following reasons, the Court finds that Defendant is entitled to qualified immunity.  Defendant's motion for summary judgment [41] is granted, and the Court will enter summary judgment for Zelechowski.

## II.    FACTUAL BACKGROUND[1]

The events of this lawsuit took place in May of 2020 in and around South Union Township and Georges Township in Fayette County, Pennsylvania.  Brandon Kissinger ("Kissinger") was in a relationship with Louise Sutton ("Sutton").  (Docket No. 45-1 at 24).  But, on May 24, 2020, Sutton spent the night at the home of her ex-boyfriend, Rittacco, who she had dated for seven years.  (*Id.*).  Rittacco believed that he and Sutton were "back together."  (*Id.* at 47).

Kissinger tracked down Rittacco and Sutton on May 25 around 3:30 p.m. as Rittacco was driving Sutton and his sister, Autumn, to work.  (*Id.* at 13, 24, 47).  Kissinger followed the vehicle for a time before overcoming it and stopping his own car in the roadway such that Rittacco was forced to bring his vehicle to rest.  (*Id.* at 24; Docket No. 45-7 at 24–25).  Kissinger exited his vehicle and approached the passenger side door where Sutton was seated.  (Docket No. 45-1 at 24, 47).  Kissinger shouted at Sutton to get out of the car.  (*Id.* at 24).  Rittacco then pulled out his handgun[2] and, according to Sutton, told Kissinger that he would be killed if he tried opening the door.  (*Id.*).  Kissinger backed away and returned to his vehicle.  (*Id.* at 13, 74).

Kissinger was upset.  (Docket Nos. 45-7 at 27; 45-8 at 51).  After the roadway incident, he texted Sutton several times.  (Docket Nos 45-8 at 48, 51).  Kissinger told Sutton that he wanted to talk to her at the Long John Silver's restaurant where she worked and threatened that he "got something for [Rittacco]."  (Docket No. 45-8 at 51).

---

[1]    The facts herein are compiled from the parties' respective Concise Statements of Material Facts, their Replies thereto, and their Appendixes. (Docket Nos. 43–46, 53–54, 56, 58). Unless otherwise specified, the facts of record are uncontested. Any disputed evidence is viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

[2]    Rittacco submits that there is a factual dispute whether he "brandished" his firearm or "pointed" it at Kissinger. (Docket No. 53 ¶¶ 39, 57). For reasons discussed later, this fact is immaterial to Zelechowski's probable cause determination.

Sutton feared going to the restaurant.  (Docket No. 45-1 at 24).  She called her supervisors to say that she would be late to work because she did not feel safe and told one manager, Sarah Reid, to call the police if Kissinger showed up.  (*Id*; Docket No. 45-1 at 23).  Sutton and Rittacco dropped off Autumn, picked up Rittacco's friend, Philip Rafail, and returned to Rittacco's residence.  (Docket No. 45-1 at 24).

Kissinger went to the Long John Silver's.  Video footage showed him arriving at 4:04 p.m., ordering a beverage, and leaving at 4:07 p.m.  (*Id.* at 5).  He returned ten minutes later with his friend, Robert Lukehart ("Lukehart"), and entered the restaurant while Lukehart waited outside.  (*Id.*).  At 4:22 p.m., Reid called 9-1-1 to report that Sutton was "afraid to come to work because her ex-boyfriend was waiting with a gun"[3] and that Kissinger was in the parking lot asking for Sutton.  (*Id.* at 4).  Reid also texted Sutton to inform her that Kissinger and another man were in the Long John Silver's parking lot and that police had been contacted.  (*Id.* at 23).  A police officer was dispatched to the Long John Silver's.  (*Id.* at 4).

Kissinger and Lukehart left the Long John Silver's at 4:34 p.m. to get food at a nearby McDonald's.  (*Id.* at 44).  Three minutes later, Rittacco pulled his car into the Long John Silver's parking lot with Rafail and Sutton.  (*Id.* at 3).  Sutton left the car and walked into the restaurant.  (*Id.* at 5).  Kissinger, from McDonald's, saw Rittacco's car enter the Long John Silver's parking lot.  (*Id.* at 44).  He retrieved Lukehart, who was waiting for his food, and drove back to the Long John Silver's.  (*Id.*; Docket No. 45-7 at 17).

After dropping off Sutton, Rittacco backed his car out of the parking spot and turned to exit onto the street.  (Docket No. 45-7 at 57).  But he was stopped by Kissinger, who had rapidly entered the parking lot nearly hitting Rittacco's vehicle with his own.  (*Id;* Docket No. 45-1 at 46).

---

[3]     There is no evidence that Kissinger was armed and Rittacco admitted to Zelechowski that, to his knowledge, Lukehart was unarmed.  (Docket No. 45-7 at 45).

Rittacco pulled his car back into the parking spot.  (Docket No. 45-7 at 57).  Immediately, Lukehart and Kissinger jumped out of the car and ran towards Rittacco, who remained in his vehicle.  (*Id.*; Docket No. 45-1 at 46).  Lukehart arrived at the driver's window and was struck by three rounds from Rittacco's nine-millimeter Sig Sauer pistol—once in the right forearm and twice in the chest. (Docket Nos. 45-1 at 3, 7; 45-7).  Rittacco then drove away.  (Docket No. 45-1 at 3).  The time was 4:38 p.m.  (*Id.* at 5).

A state trooper, who had been waiting at a nearby intersection when the shooting occurred, arrived at the Long John Silver's one minute later.  (*Id.* at 5).  An ambulance arrived at 4:49 p.m. (*Id.* at 5, 16).  Despite their efforts, Lukehart was pronounced dead at the scene at 6:15 p.m.  (*Id.* at 3, 6).

In the meantime, Rittacco contacted the police.  At 4:40 p.m., minutes after leaving the Long John Silver's, he called 9-1-1 to report that he had shot a man three times for attempting to enter his vehicle and then drove away to avoid a second man who was also coming after him.  (*Id.* at 4).  Rittacco told the dispatcher that his actions were taken in self-defense.  (*Id.*).   He gave police the address where he would be waiting for law enforcement.  (*Id.* at 9).

When police arrived, Rittacco surrendered.  (*Id.*).   Officers placed him into custody, advised him of his *Miranda* rights, and asked about the handgun used in the shooting.  (*Id.*). Rittacco directed them to a nearby trash can where his father had placed it, unloaded.  (*Id.* at 9, 50–51).  The officers took Rittacco back to the State Police barracks in Uniontown for questioning. (Docket No. 45-10 at 10).

Zelechowski, a state trooper with nearly six years of experience at the time, was appointed lead investigator of the incident.  (Docket No. 45-8 at 7).  She began her investigation by reporting to the Long John Silver's where she interviewed Kissinger and Sutton and reviewed video

surveillance. (*Id.* at 101). Zelechowski stayed on-scene until the forensics team began its work, and then she returned to the barracks where she interviewed Kissinger, for a second time, and Rittacco. (*Id.* at 101–03, 107). Rittacco told Zelechowski that he shot Lukehart "because I thought they were going to kill me, shoot me, or something." (Docket No. 45-1 at 47). Yet, he admitted that he neither saw Lukehart with any weapons nor heard Lukehart say anything. (*Id.*).

Zelechowski testified that, later in the evening, she attended "a meeting with the district attorney, [her] supervisor, and the troopers that knew the most information." (*Id.* at 105). According to Zelechowski, the district attorney made the decision to charge Rittacco with Lukehart's murder and charges related to the roadway incident and Zelechowski's supervisor concurred. (*Id.*). Then, under the oversight of the district attorney and her supervisor, Zelechowski drafted the affidavits of probable cause. [4] (*Id.* at 107–08).

On May 25, Zelechowski charged Rittacco with criminal homicide under 18 Pa. C.S.A. § 2501(a) for shooting Lukehart. (Docket No. 45-6 at 2–5). This charge was filed in District Court 14-3-02 before Magisterial District Judge Jennifer Jeffries. (*Id*. at 2). In the affidavit of probable cause supporting the charge of criminal homicide, Zelechowski provided the following description of the incident:

> Justin RITTACCO arrived at Long John Silvers . . . to drop his passenger off at work. As he was attempting to leave, a black Acura sedan pulls up behind him. The DEFENDANT then pulls back into the parking spot as the occupants of the Acura exit the vehicle. The VICTIM, Robert LUKEHART, exited the passenger side of the Acura and ran up to the driver side window of the DEFENDANT's vehicle. The DEFENDANT then fires approximately 3 rounds from a 9mm Sig Sauer pistol, striking the VICTIM. The VICTIM falls to the ground and the DEFENDANT then flees the scene.

---

[4]     Rittacco denies that Zelechowski worked with the district attorney to file charges but admits that Zelechowski testified as much. (Docket No. 53 at ¶¶ 84–92).

(*Id.* at 5).  Zelechowski also explained that Rittacco, in his interview with police, "related that he

shot the unknown male because he approached his vehicle in an aggressive manner and he felt his

life was threatened."  (*Id.*).  Despite the purported involvement of the District Attorney,

Zelechowski did not check the box on the criminal complaint form indicating that an attorney for

the Commonwealth approved the charge and the complaint is not signed by the District Attorney.[5]

(*Id*. at 2).

Due to his brandishing a pistol during the earlier roadway incident with Kissinger,

Zelechowski also charged Rittacco with simple assault under 18 Pa. C.S.A § 2701(a)(3), recklessly

endangering another person under 18 Pa. C.S.A. § 2705, and making terroristic threats under 18

Pa. C.S.A § 2706(a)(1).  (*Id.* at 34–38).  These charges were filed in District Court 14-3-02 before

Magisterial District Judge Daniel Shimshock.  (*Id*. at 34).  In Zelechowski's affidavit of probable

cause for these charges, she included the following explanation:

> On 05/24/20, the VICTIM, Brandon KISSINGER related that around 1530 hours
> he observed his girlfriend, Louise SUTTON in the passenger side of her ex-
> boyfriend, Justin RITTACCO's black Lincoln MKZ . . . He followed said vehicle
> onto SR 857, he then passed said vehicle and stopped in the roadway . . . He then
> exited the vehicle and walked to the passenger side in an attempt to confront his
> girlfriend. SUTTON refused to put down the window to speak with KISSINGER.
> The DEFENDANT, Justin RICCATTO [sic] then pointed a black pistol at
> KISSINGER and told him to leave. KISSINGER then returned to his vehicle and
> drove away.

(*Id.* at 38).  Zelechowski disclosed Rittacco's belief that he acted in self-defense, writing, "The

DEFENDANT . . . admitted that he pointed the pistol . . . at KISSINGER because he approached

the vehicle in an aggressive manner and he felt his life and SUTTON's were being threatened."

(*Id.*).  Once again, Zelechowski neither checked the box for attorney approval nor secured the

signature of an attorney.  (*Id*. at 34).

---

[5] Zelechowski testified at her deposition that, in Fayette County, "they don't . . . check the box and sign [police
criminal complaints] like some other D.A.s do."  (Docket No. 45-8 at 109).

After the charges were accepted by the magistrate judges, arrest warrants were issued, and Rittacco was then transferred to the Fayette County Jail where he remained in custody pending the disposition of the charges.  Magistrate Judge Shimshock held a joint preliminary hearing regarding both cases on June 29.  (Docket No. 45-7 at 2).  Assistant District Attorney Robert Harper appeared for the Commonwealth, and Attorney William Difenderfer appeared for Rittacco.  (*Id.*).  Kissinger and Zelechowski were subjected to direct examination by Assistant District Attorney Harper and cross examination by Attorney Difenderfer.  (*Id.* at 3).  Attorney Difenderfer admitted it was "going to be up to the jury" whether Rittacco was "justified or not" in shooting Lukehart and acknowledged that "justification is not a defense at this level," but asked the court "to dismiss the charges of murder of the first or third degree" and hold a manslaughter charge "for a jury."  (*Id.* at 51–52).  The court found that the Commonwealth had met its burden of making out a prima facie criminal case against Rittacco, and all of the charges were held over for trial in the Fayette County Court of Common Pleas.  (Docket No. 45-7 at 53–54).

On September 30, Rittacco appeared before the Court of Common Pleas where bail was set at $50,000.  (Docket Nos. 43 at ¶ 109; 45-2 at 10).  Rittacco posted bail that same day and was released subject to conditions, including house arrest with electronic monitoring.  (Docket Nos. 43 at ¶ 110; 45-2 at 10).  His criminal trial began on December 20, 2021, and, the next day, a jury found Rittacco not guilty on all counts.  (Docket Nos. 43 at ¶¶ 111–12; 45-2 at 13).  Rittacco spent 129 days in Fayette County Jail and another 450 days on house arrest awaiting the disposition of the charges.  (Docket No. 54 at 60).

## III.   PROCEDURAL BACKGROUND

On April 11, 2022, Rittacco sued Zelechowski and Troopers Crowley and Solis under 42 U.S.C. § 1983 for malicious prosecution, false arrest, false imprisonment, and unlawful taking.

(Docket No. 1 at 10–18).  The Defendants collectively answered on August 29, 2022.  (Docket No. 10).

After discovery, the Defendants moved for summary judgment on January 26, 2024.[6] (Docket No. 41).  The parties proceeded to brief and argue their respective positions for and against summary judgment.  (Docket Nos. 42–45; 52–55; 58).  In Rittacco's response to the Defendants' motion for summary judgment, he voluntarily withdrew Count V of his complaint for unlawful taking and his claims against Crowley and Solis.  (Docket No. 52 at 3).  Accordingly, the Court dismissed Count V and the claims against Crowley and Solis, with prejudice, and dismissed Crowley and Solis from this action.  (Docket Nos. 47, 57).  All that remains for the Court's consideration are Rittacco's claims against Zelechowski for malicious prosecution, false arrest, and false imprisonment.  Having been fully briefed and argued by both parties, the Motion for Summary Judgment is ripe for disposition.

## IV.    LEGAL STANDARD

Summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (citations omitted).  Further, "[a] dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Clews v. Cnty. of Schuylkill*, 12 F.4th 353, 358 (3d Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*,

---

[6]     The Court notes that the parties participated in early neutral evaluation with David B. White, Esq, but the case was not resolved at that time.  (Docket No. 24).

665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

A party seeking summary judgment "must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof." *Conboy v. U.S. Small Bus. Admin.*, 992 F.3d 153, 160 (3d Cir. 2021) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations, unsupported assertions or denials of its pleadings." *Conboy*, 992 F.3d at 160; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In this regard, the non-movant must come forward with more than "some metaphysical doubt as to the material facts." *Conboy*, 992 F.3d at 160; *see also Matsushita*, 475 U.S. at 586-87.

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, deposition testimony, admissions, and answers to interrogatories to demonstrate the existence of a genuine issue. *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324).

## V.    DISCUSSION

Zelechowski asserts that she is entitled to qualified immunity because she did not act unreasonably or knowingly violate Rittacco's rights. (Docket No. 42 at 6–8). Alternatively, Zelechowski claims that she has derivative prosecutorial immunity because she was acting at the

direction of the district attorney, (*id.* at 3–6), and that Rittacco cannot establish the elements of his malicious prosecution, false arrest, and false imprisonment claims because she had probable cause to charge him with these offenses, (*id.* at 8–26).  Rittacco counters that Zelechowski failed to timely raise the defense of derivative prosecutorial immunity in her Answer and that there are genuine disputes of material fact which preclude summary judgment in her favor.  (Docket No. 52 at 21–23).

After reviewing the parties' arguments in light of the prevailing standards, the Court holds that Zelechowski is entitled to qualified immunity because Rittacco has not shown that he suffered a deprivation of any constitutional right and has otherwise failed to demonstrate that Zelechowski violated his clearly established rights.  Given such ruling, the Court need not resolve the parties' disputes as to the timeliness of Zelechowski's assertion of derivative prosecutorial immunity or the merits of same.

### A.  *Qualified Immunity Standard*

"Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021) (internal quotation marks and citations omitted). Included among those rights are the constitutional rights of a person to be free from malicious prosecution, false arrest, and false imprisonment by state authorities under the Fourth Amendment. *See Thompson v. Clark*, 142 S. Ct. 1332, 1336–1338 (2022); *Williams v. City of N.Y.*, 967 F.3d 252, 263 (3d Cir. 2020); *Groman v. Twp. of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995).  "The doctrine of qualified immunity shields officers from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11–12 (2021) (internal quotation marks

and citation omitted).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *Id.*

A police officer is shielded from suit by qualified immunity unless, (1) "the officer's conduct violated a constitutional right" and (2) "the right was clearly established, such that it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.*  "Courts may begin their inquiry with either prong." *Id.*  At the summary judgment stage, "the burden is on the officer to establish an entitlement to qualified immunity."  *Peroza-Benitez*, 994 F.3d at 165.

For the first prong of the qualified immunity analysis, in the malicious prosecution context, a plaintiff must show that: (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended without a conviction; (3) the proceeding was initiated without probable cause; (4) the defendant acted maliciously for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.  *Est. of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003); *Thompson v. Clark*, 142 S. Ct. at 1341 (2022) ("[A] Fourth Amendment claim under § 1983 for malicious prosecution does not require the plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence.  A plaintiff need only show that the criminal prosecution ended without a conviction.").  In the false arrest and false imprisonment context, "a plaintiff must establish: (1) that there was an arrest [or imprisonment]; and (2) that the [detention] was made without probable cause."  *Williams*, 967 F.3d at 263 (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 6800 (3d Cir. 2012)); *see Olender v. Twp. of Bensalem*, 32 F. Supp. 2d 775, 791 (E.D. Pa. 1999) ("false arrest and false imprisonment are essentially the same claim").

As to the second prong of the qualified immunity analysis, the phrase "clearly established" means that "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *James v. N.J. State Police*, 957 F.3d 165, 169 (3d Cir. 2020) (quotation marks and citation omitted). "The inquiry is an 'objective (albeit fact-specific) question,' under which '[an officer]'s subjective beliefs . . . are irrelevant.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). The Court must "consider[ ] only the facts that were knowable to the defendant officer." *Id.* (quoting *White v. Pauly*, 580 U.S. 73, 76–77 (2017)). The Court only analyzes "clearly established rights as of" the date of the arrest and initiation of criminal charges; here, May 25, 2020. *See id.* at 170.

The Supreme Court has "repeatedly told courts not to define clearly established law at too high a level of generality." *Bond*, 142 S. Ct. at 11. "It is not enough that a rule be suggested by then-existing precedent; the 'rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (quotation marks and citation omitted). "Such specificity is especially important in the Fourth Amendment context where it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id.* at 11–12. Put another way, "settled law," *D.C. v. Wesby*, 583 U.S. 48, 63 (2018), must "squarely govern the specific facts at issue," *Kisela v. Hughes*, 584 U.S. 100, 104 (2018).

After defining the right at issue at the appropriate level of generality, the Court must look to "analogous Supreme Court precedent, as well as binding opinions from" the Third Circuit to determine whether the right is "clearly established." *Peroza-Benitez*, 994 F.3d at 165. The Court must also "consider whether there is a robust consensus of cases of persuasive authority in the Courts of Appeals," and the district courts. *Id.* at 165-66 (internal quotation marks and citation

omitted).  In this regard, although the Supreme Court "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7-8 (2021) (citation omitted). "In rare cases," a plaintiff may show that a right is clearly established if the "violation [is] obvious." *James*, 957 F.3d at 169 (quotation marks and citation omitted).

  *B.  Whether Zelechowski Violated Rittacco's Constitutional Rights*

  Beginning at the first prong of the qualified immunity analysis, the Court "must decide whether the facts that a plaintiff has shown make out a violation of a constitutional right." *ADA Anglemeyer v. Ammons*, 92 F.4th 184, 188 (3d Cir. 2024) (citation, quotation marks, and ellipses omitted).  To state it differently, the Court must decide whether Rittacco has established claims of malicious prosecution, false arrest, or false imprisonment.

  The gravamen of all three constitutional violations is a lack of probable cause.  *See Sheedy v. City of Phila.*, 184 F. App'x 282, 284 (3d Cir. 2006) ("probable cause defeats a claim for malicious prosecution and for false imprisonment or arrest").  "Probable cause exists when the 'facts and circumstances within the officer's knowledge' would cause 'a prudent person' to believe 'that the suspect has committed . . . an offense.'" *Brackbill v. Ruff*, No. 22-162, 2023 WL 5447271, at *2 (3d Cir. 2023) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).  It "requires more than mere suspicion; however, it does not require that the officer have evidence sufficient to prove guilty beyond a reasonable doubt." *Zimmerman v. Corbett*, 873 F.3d 414, 418 (3d Cir. 2017) (citation omitted).  "'[K]nowledge of a credible report from a credible eyewitness' is 'sufficient to establish probable cause.'" *Greenberg v. Chester Downs & Marina, LLC*, 694 F. App'x 877, 879 (3d Cir. 2017) (quoting *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 790 & n.8 (3d Cir. 2000)) (brackets omitted).  "The probable cause inquiry looks to the totality of the circumstances; the

standard does not require that officers correctly resolve conflicting evidence or that their determinations of credibility, were, in retrospect, accurate." *Wright v. City of Phila.*, 409 F.3d 595, 603 (3d Cir. 2005).

"[T]he common law presumption raised by a magistrate's prior finding that probable cause exists does not apply to section 1983 actions." *Merkle*, 211 F.3d at 789. But "a prior probable cause determination at a preliminary hearing may be very strong evidence in favor of a finding of probable cause." *Lee v. Fiscus*, No. 1:22-cv-365, 2024 WL 759083, at *11 (W.D. Pa. Jan. 18, 2024) (citing *Zimmerman v. Corbett*, No. 13-2788, 2015 WL 539783, at *5 (M.D. Pa. Feb. 10, 2015)). And a "Pennsylvania court's decision to schedule [a criminal defendant] for trial is evidence of an independent, contemporaneous judicial determination that there was sufficient probable cause." *Wheeler v. Wheeler*, 639 F. App'x 147, 151 (3d Cir. 2016).

Having carefully considered the parties' positions in light of the governing standards and applicable law, the Court finds that Zelechowski is entitled to qualified immunity at prong one because she did not violate Rittacco's Fourth Amendment rights when she had probable cause to arrest, imprison, and charge him with criminal homicide, simple assault, making terroristic threats, and reckless endangerment.

### 1. Criminal Homicide

The Court must first independently consider whether Zelechowski had probable cause to arrest and prosecute Rittacco for criminal homicide. "A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another being." 18 Pa. C.S.A. § 2501(a). "The use of a deadly weapon on a vital part of the human body is sufficient to establish the specific intent to kill." *Commonwealth v. Randolph*, 873 A.2d 1277, 1281 (Pa. 2005)

(citation omitted).   The chest is considered a vital part of the human body.   *Commonwealth v. Hanible*, 836 A.2d 36, 40 (Pa. 2003).

Zelechowski had probable cause to arrest and charge Rittacco with criminal homicide because it was reasonable for her to believe that Rittacco shot Lukehart in the chest with a deadly weapon and that Lukehart died.   First, Zelechowski had probable cause to believe that Rittacco shot Lukehart.   Rittacco called 9-1-1 to report that he shot a man three times, (Docket No. 45-1 at 4), and later told Zelechowski the same, (*id.* at 47–48); Kissinger told Zelechowski at the Long John Silver's that Lukehart "walked to RITTACCO's vehicle and was shot as soon as he approached the driver side door," (*id.* at 13); and video surveillance viewed by Zelechowski showed that "LUKEHART exits the passenger side . . . runs up to the driver side of RITTACCO's vehicle and then instantly falls to the ground," (*id.* at 5).   Second, Zelechowski had probable cause to believe that Rittacco shot Lukehart in the chest.   The first officer to respond to the accident reported that Lukehart had "two gunshot wounds to the upper chest."   (*Id.* at 7).   And, finally, Lukehart was pronounced dead at 6:15 p.m.   (*Id.* at 6).   Zelechowski's affidavit of probable cause summarized these key facts.[7]   (Docket No. 45-6 at 5).

Rittacco counters this finding of probable cause by arguing that Zelechowski failed to provide enough information in her affidavit regarding his claim of self-defense.   To that end, Zelechowski noted in the affidavit that Rittacco "related that he shot the unknown male because he approached his vehicle in an aggressive manner and felt his life was threatened."   (Docket No.

---

[7]      "On 05/24/20 at approximately 1637 hours, the DEFENDANT, Justin RITTACCO arrived at Long John Long John [sic] Silvers located at 548 Morgantown Rd, South Union Township, Fayette County, PA to drop his passenger off at work.   As he was attempting to leave, a black Acura sedan pulls up behind him.   The DEFENDANT then pulls back into the parking spot as the occupants of the Acura exit the vehicle.   The VICTIM, Robert LUKEHART exited the passenger side of the Acura and ran up to the driver side window of the DEFENDANT's vehicle.   The DEFENDANT then fires approximately 3 rounds from a 9mm Sig Sauer pistol, striking the VICTIM.   The VICTIM falls to the ground and the DEFENDANT then flees the scene . . . The VICTIM, Robert LUKEHART was pronounced dead at the scene at approximately 1815 hours.   He was observed to have two bullet holes to the chest and one to the right forearm."   (Docket No. 45-6 at 5).

45-6 at 5).  Rittacco asserts that Zelechowski should have also included information about the hostile roadway encounter between Rittacco and Kissinger, Kissinger's repeated attempts to contact Sutton to include his messages threatening Rittacco, Kissinger's "wild and reckless" behavior in the Long John Silver's parking lot, and Lukehart and Kissinger's attempt to rush and attack Rittacco with knowledge that the latter was armed.  (Docket No. 52 at 15–16).

First, the Court notes that a Pennsylvania magistrate judge heard testimony about this "omitted" information at Rittacco's preliminary hearing and made "an independent, contemporaneous judicial determination that there was sufficient probable cause."  *See Wheeler*, 639 F. App'x at 151.  At the hearing, the judge heard testimony from Kissinger and Zelechowski about the roadway incident and the shooting and viewed Long John Silver's surveillance video. (Docket No. 46-7 at 3, 42).  Rittacco's attorney had the opportunity to cross-examine both witnesses and asserted that it would be for a jury to decide whether Rittacco was "justified" in shooting Lukehart.  (*Id.* at 3, 51).  The judge learned about Kissinger's erratic and reckless driving, the threatening texts he sent to Sutton, his waiting at Long John Silver's to confront Sutton and Rittacco, and his and Lukehart's aggressive behavior in the Long John Silver's parking lot.  (*Id.* at 22–24, 27–28, 30–36).  In the end, the judge concluded that the Commonwealth had made out its prima facie case and formally arraigned Rittacco.  (*Id.* at 53–54).

Second, the Court finds that Rittacco's "exculpatory defense, no matter how compelling could not defeat th[e] already-present probable cause."  *See Davis v. Malitzki*, 451 F. App'x 228, 234 (3d Cir. 2011) (citing *Ricciuti v. N.Y. City Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997)). *Accord Tarr v. City of Pittsburgh*, 800 F. App'x 131, 135 (3d Cir. 2020) ("an affirmative defense to an alleged crime does not necessarily vitiate probable cause" (quoting *Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019)).  Even more, Police officers are generally not required to consider an

affirmative defense that is not "a clear cut matter in criminal prosecutions," *Sands v. McCormick*, 502 F.3d 263, 269 (3d Cir. 2007), or "specifically included in the statute setting forth the elements of the crime," *Holman v. City of New York*, 564 F.3d 225, 230 (3d Cir. 2009).  *But see Mazuka v. Rice Twp. Police Dep't*, 655 F. App'x 892, 899 (3d Cir. 2016) (Smith, J., concurring) ("we have *never* held that an affirmative defense is a relevant consideration in the probable cause analysis"). Here, self-defense is not included in Pennsylvania's criminal homicide statute and it is not a "clear cut matter" fit for resolution by a charging officer.  *See, e.g.*, *Gorman v. Bail*, 947 F. Supp.3d 509, 523 (E.D. Pa. 2013) ("self-defense is inherently an issue that must be decided at trial"); *Commonwealth v. Green*, 273 A.3d 1080, 1084 (Pa. Super. Ct. 2022) ("Self-defense is a complete defense to a homicide charge if 1) the defendant reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force to prevent such harm; 2) the defendant did not provoke the threat that resulted in the slaying; and 3) the defendant did not violate a duty to retreat.") (citations and brackets omitted).

Overall, this Court's evaluation of the record in light of the prevailing standards leads it to conclude that Zelechowski had probable cause to arrest and prosecute Rittacco for criminal homicide.  So, Rittacco has failed to show that he suffered a deprivation of his constitutional rights with respect to his prosecution, arrest, and imprisonment for criminal homicide.

2.   Simple Assault, Terroristic Threats, and Recklessly Endangering Another Person

Next the Court must decide whether Zelechowski had probable cause to charge Rittacco with the three crimes attendant to the roadway incident—simple assault, making terroristic threats, and recklessly endangering another person.  In Pennsylvania, "a person is guilty of assault if he attempts by physical menace to put another in fear of imminent serious bodily injury."  18 Pa. C.S.A. § 2701(a)(3).  "A person commits the crime of terroristic threats if [he] communicates,

either directly or indirectly, a threat to commit any crime of violence with intent to terrorize another." *Id.* § 2706(a)(1). And a person recklessly endangers another "if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily harm." *Id.* 2705. Probable cause can be found to support charges of simple assault and reckless endangerment when a person points a loaded or unloaded firearm at another. *See, e.g,* *Commonwealth v. Bruder*, No. 1616 MDA 2021, 2022 WL 15065088, at *4 (Pa. Super. Ct. Oct. 27, 2022) ("The law is clear that pointing an unloaded firearm at another person is sufficient . . . to support a conviction for simple assault."); *Commonwealth v. Rivera*, 597 A.2d 690, 695 (Pa. Super. Ct. 1991) ("knowingly pointing a loaded weapon at another person may be sufficient to convict a defendant for reckless endangerment"). And probable cause can be found to support a charge of terroristic threats when a person expresses an intent to use the weapon. *See, e.g.*, *Commonwealth v. Jones*, No. 638 MDA 2023, 2023 WL 8056562, at *4 (Pa. Super. Ct. Nov. 20, 2023) ("evidence that a [criminal defendant] brandished a weapon at [a person] while using language indicating that he was willing to use it is sufficient to prove" the crime of terroristic threats).

Zelechowski had probable cause to arrest and charge Rittacco with simple assault, making terroristic threats, and reckless endangerment because it was reasonable for her to believe that Rittacco pointed a firearm at Kissinger and demonstrated an intent to use it. Zelechowski wrote in the affidavit of probable cause that Rittacco "pointed a black pistol at KISSINGER and told him to leave." (Docket No. 45-6 at 38). This statement was supported by interviews with Kissinger, Sutton, and Rittacco, himself. Kissinger told Zelechowski that Rittacco remained silent and pointed a pistol at him when he approached the vehicle. (Docket No. 45-1 at 43). Sutton told Zelechowski, "[w]hen KISSINGER attempted to open the passenger door, RITTACCO pulled his

gun from his holster and pointed it at KISSINGER [and] stated, 'if you try to open the car door, I will kill you." (Docket No. 45-1 at 24).  Similarly, Rittacco related to Zelechowski, that, "[w]hen KISSINGER attempted to open the passenger door, [he] pulled his firearm and pointed it at [Kissinger]" and "told KISSINGER to 'get the [expletive] away from the car.'"  (Docket No. 45-1 at 48).

Rittacco, at this stage, argues that it is an issue of material fact whether he pointed his firearm at Kissinger.  He submits that he "brandished" but did not "point" his firearm at Kissinger.  (Docket No. 53 ¶¶ 39, 57).  Whether Rittacco actually pointed his firearm at Kissinger is not material to the Court's probable cause inquiry.  *See Wright*, 409 F.3d at 602 ("the constitutional validity of the arrest does not depend on whether the suspect actually committed the crime") (citation omitted).  Instead, the material facts are those that Zelechowski had before her when making the decision to arrest and initiate charges against Rittacco.  *See Brackbill*, 2023 WL 5447271, at *2 ("Probable cause exists when the 'facts and circumstances within the officer's knowledge' would cause 'a prudent person' to believe 'that the suspect has committed . . . an offense.'") (citation omitted).   And, on May 24, 2020, the accused, the victim, and an eyewitness all told Zelechowski that Rittacco had pointed a firearm at Kissinger.

Rittacco also asserts that Zelechowski unlawfully omitted exculpatory evidence that would support a finding that he acted in self-defense.  (Docket No. 52 at 7–13).  As before, the Court finds this argument unavailing.  First, Zelechowski gave due credence to Rittacco's claim of self-defense when she wrote that Rittacco pointed his firearm at Kissinger because the latter "approached the vehicle in an aggressive manner and [Rittacco] felt his life and SUTTON's were being threatened."  (Docket No. 45-6 at 38).  Second, Rittacco's purported "exculpatory defense, no matter how compelling, could not defeat th[e] already-present probable cause." *See Davis* 451

F. App'x at 234.  And third, a magistrate found that the Commonwealth had established a prima facie case for the crimes of simple assault, making terroristic threats, and reckless endangerment after hearing testimony from Kissinger and Zelechowski.  (Docket No. 45-7 at 54–55).  *See Wheeler*, 639 F. App'x at 151.[8]

This Court's evaluation of the record in light of the prevailing standards leads it to conclude that Zelechowski had probable cause to arrest and prosecute Rittacco with simple assault, making terrorist threats, and reckless endangerment.  So, Rittacco has failed to show that he suffered a deprivation of his constitutional right with respect to his prosecution, arrest, and imprisonment for these offenses.

### C.  Whether Zelechowski Violated a Clearly Established Right

Continuing with prong two of the qualified immunity analysis, the Court "must determine whether the right at issue was clearly established at the time of the defendant's alleged misconduct."  *ADA Anglemeyer*, 92 F.4th at 188.  After careful consideration, the Court finds that Zelechowski is also entitled to qualified immunity at prong two because Rittacco has not demonstrated that Zelechowski violated a clearly established right.

### 1.  Defining the Constitutional Right at Issue

At the first step of prong two of the qualified immunity analysis, the Court must define the "right allegedly violated with a 'high degree of specificity.'"  *ADA Anglemeyer*, 92 F.4th at 191 (quoting *Wesby*, 583 U.S. at 63).  Rittacco submits that Zelechowski violated his right to be free

---

[8]        Though the Court found that Zelechowski had probable cause to charge Rittacco with all three offenses, she need only show probable cause for one to defeat Rittacco's claims of malicious prosecution, false arrest, and false imprisonment.  "[E]stablishing probable cause on one charge of multiple charges will defeat a claim of false arrest." *See Harper v. City of Phila.* No. 21-2262, 2022 WL 17337574, at * (3d Cir. Nov. 30, 2022) (citing *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994) and *Startzell v. City of Phila.*, 533 F.3d 183, 204 n.14 (3d Cir. 2008)). And, "where the circumstances leading to the arrest and prosecution were totally intertwined," *Johnson v. Knorr*, 477 F.3d 75, 82 n.9 (3d Cir. 2007), probable cause for one criminal charge "disposes of [a plaintiff's] malicious prosecution claims with respect to all of the charges brought against [him]," *Wright v. City of Phila.*, 409 F.3d 595, 604 (3d Cir. 2005).

from an officer's "failure to include exculpatory evidence in the affidavit of probable cause used to arrest [him]." (Docket No. 52 at 24).

Rittacco's definition is too broad. Rittacco is crafting his purported right to fit within the confine of those cases which have affirmed "the right to be free from an arrest based on an officer's deliberate or reckless omission of facts to a judge assessing probable cause, *when those facts would be sufficient to vitiate probable cause*." *Tarr v. City of Pittsburgh*, No. 2:16-cv-1424, 2019 WL 967802, at \*12 (W.D. Pa. Feb. 28, 2019) (quoting *Richter v. Pa. State Police*, No. 15-775, 2018 WL 2984966, at \*22 (W.D. Pa. June 14, 2018)), *aff'd*, 800 F. App'x 131 (3d Cir. 2020). In *Richter*, a case cited by Rittacco, the court found that officers omitted exculpatory information showing that, in a single car accident, the decedent, not Richter, was driving. 2018 WL 2984966, at \*7. And in *Wilson v. Russo*, a second case cited by Rittacco in support of his purported right, the Third Circuit found that a detective omitted exculpatory information undermining the identification of Wilson as the robber. 212 F.3d 781, 791 (3d Cir. 2000) (explaining that the detective "should have mentioned [that]: (1) the robber was originally identified as someone 6'3" to 6'5", while Wilson is four to seven inches shorter; (2) one of the two victim-witness with ample opportunity to view the robber failed to identify Wilson when shown a photo array; and (3) [a witness] saw Wilson out in the shopping center when he was supposedly in the flower shop").

Here, Rittacco does not assert that Zelechowski omitted exculpatory information which would have vitiated a finding of probable cause. Instead, he claims that Zelechowski omitted evidence which would apply to a finding that he acted in self-defense: "statements about Mr. Kissinger's aggressive, hostile and outrageous behavior toward the Plaintiff that same day, which caused the plaintiff to fear for his life; witness statements that the Plaintiff acted in self-defense; and that Mr. Lukehart aggressively attempted to open the Plaintiff's driver's side door." (Docket

No. 1 ¶ 64).  So, the Court finds that the purported right is more accurately defined as follows: the right to be free from detention and prosecution based on an officer's deliberate or reckless omission of facts to a judge assessing probable cause when those facts give rise to the possible affirmative defense of self-defense.  *See, e.g.*, *Tarr*, 2019 WL 967802, at *12.

      2.  <u>Whether the Law was Clearly Established</u>

Based on the Court's definition of the right at issue, it must determine whether "clearly established" law, as of May 25, 2020, held that Zelechowski's affidavit of probable cause amounted to "an unreasonable seizure pursuant to legal process."  *See Thompson*, 142 S. Ct. at 1337; *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 469 (3d Cir. 2016).  Put another way, the Court must determine whether clearly established law showed that Zelechowski unreasonably omitted exculpatory evidence of self-defense from her affidavit.  *See Dempsey*, 834 F.3d at 469.

For one thing, Rittacco has identified no precedent factually analogous to the instant matter that would show that Zelechowski violated a clearly established right on May 25, 2020.  Even more, he has not shown that Fourth Amendment precedent, whether from the Supreme Court, Third Circuit, or elsewhere would put the question "beyond debate."  As discussed, the two cases he offers—*Wilson v. Russo* and *Richter v. Pa. State Police*—support a finding that it is unlawful to omit exculpatory evidence when those facts could vitiate probable cause, an inapplicable rule here.

The Court, after careful independent review, has found no caselaw remotely analogous that would establish the existence of Rittacco's right, let alone support a finding that the right was "clearly established."  The Third Circuit has yet to decide whether officers must include evidence of self-defense in an affidavit, *Tarr*, 2019 WL 967802, at *13, but it has explained that "police officers generally have no responsibility to determine the applicability of certain affirmative

defenses," *Wagner v. N. Berks Reg'l Police Dep't*, 816 F. App'x 679, 684 (3d Cir. 2020) (citing *Sands v. McCormick*, 502 F.3d 263, 269 (3d Cir. 2007)), and "no obligation to be aware of facts supporting complex affirmative defenses . . . let alone an obligation to disclose these facts," *id*.

As in the Third Circuit, none of the other Courts of Appeals have addressed whether a law enforcement officer must include facts pertaining to the affirmative defense of self-defense in an affidavit of probable cause.  Even after expanding the aperture to consider whether evidence of an affirmative defense is relevant *at all* to a probable cause analysis, the Court has not found a consensus among the other Circuits. *See, e.g.*, *Loftin v. City of Prentiss*, 33 F.4th 774, 780 n.2 (5th Cir. 2022) ("This court has repeatedly refused to opine on whether facts supporting the existence of an affirmative defense are relevant to the determination of probable cause.") (citations and quotation marks omitted); *Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019) ("an affirmative defense to an alleged crime does not necessarily vitiate probable cause") (citation omitted); *Dollard v. Whisenand*, 946 F.3d 342, 355 (7th Cir. 2019) ("an officer may not ignore conclusively established evidence of the existence of an affirmative defense but the Fourth Amendment imposes no duty to investigate whether a defense is valid") (citations, quotation marks, and brackets omitted); *Assenberg v. Whitman Cnty.*, 730 F. App'x 429, 433 (9th Cir. 2018) ("an affirmative defense does not defeat probable cause."); *Sanchez v. Labate*, 564 F. App'x 371, 373-74 (10th Cir. 2014) (finding not "a single Supreme Court or Tenth Circuit decision holding that law-enforcement officers must resolve a claim of self-defense before arresting someone who has admitted killing another person"); *Fridley v. Horrighs*, 291 F.3d 867, 873 (6th Cir. 2002) ("Even if the circumstances suggest that a suspect may have an affirmative defense, if a reasonable officer would not 'conclusively know' that the suspect is protected by the defense, then he is free to arrest the suspect provided there is probable cause to do so.")

There is a consensus among district courts within the Third Circuit supporting the opposite conclusion—that officers are *not* required to include facts in support of a self-defense argument in their affidavit of probable cause.  *See, e.g*, *Miller v. Snell*, No. 18-5178, 2020 WL 7769793, at *9 (E.D. Pa. Dec. 30, 2020) ("Whether the shooting was in self-defense is certainly an issue, however, it is not necessarily the Magistrate's duty to make an arguable self-defense determination when issuing an arrest warrant."); *Berrios v. City of Phila.*, 96 F. Supp. 3d 523, 532–33 (E.D. Pa. 2015) (explaining that self-defense "would need to be a part of the statutory language in the elements of the crime at issue in order to be considered" in the determination of probable cause); *Gorman*, 947 F. Supp. 2d at 523 ("[T]he Court concludes that, as a matter of law, self-defense is not the type of affirmative defense that officers must consider or disclose in affidavits of probable cause.").  In reaching its decision in *Gorman*, the district court explained, in words applicable to the matter at hand, "the Court notes that claims of self-defense to an assault necessarily admit involvement in a violent altercation. Thus, self-defense is inherently an issue that must be decided at trial, not by a police officer or a judge at a hearing to issue an arrest warrant."  *Gorman*, 947 F. Supp. 2d at 523.

Because Rittacco has not established the existence of any "clearly established" rights, "such that it would [have been clear] to a reasonable officer that [her] conduct was unlawful in the situation [she] confronted," Zelechowski is entitled to qualified immunity on Rittacco's claims of malicious prosecution, false arrest, and false imprisonment.  *See Bond*, 142 S. Ct. at 11–12.

### D.  Derivative Prosecutorial Immunity

Zelechowski asserts for the first time in her motion for summary judgment that she is entitled to derivative prosecutorial immunity. (Docket No. 42 at 3).  Rittacco maintains that she waived the defense by not raising it in her Answer and that it is unfair for him to have to defend the claim without the benefit of discovery on this issue.  (Docket No. 52 at 21–22).  He adds that

there are genuine disputes of material fact as to whether the District Attorney authorized the charges or not.  (*Id*. at 22–23).

"Absolute immunity is an affirmative defense that should be asserted in an answer."  *Desi's Pizza, Inc. v. City of Wilkes-Barre*, 321 F.3d 411, 428 (3d Cir. 2003) (citing Fed. R. Civ. P. 12(b)). Courts police this requirement "to avoid surprise and undue prejudice by providing the plaintiff with notice and the opportunity to demonstrate why the affirmative defense should not succeed." *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002).  While this Court has discretion to permit a Defendant to amend an Answer and reopen discovery, *see e.g.*, Fed. R. Civ. P. 15(a)(2), 16(b)(1)(4), some courts have refused to permit defendants to raise the defense of derivative prosecutorial immunity for the first time at the summary judgment stage given the prejudice to the plaintiff.  *See, e.g.*, *McLee v. Brown*, No. 18-1630, 2021 WL 916651, at *20 (W.D. Pa. Feb. 19, 2021) ("it would be inappropriate to allow [a defendant] to raise" the affirmative defense of derivative prosecutorial immunity for the first time on a motion for summary judgment).

Returning to the instant matter, the Court need not resolve the parties' disputes and decide whether Zelechowski provided adequate notice of derivative prosecutorial immunity because she is entitled to qualified immunity and summary judgment will be entered in her favor on that basis.

## VI.   CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [41] is granted.  An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
Senior U.S. District Judge

Dated:  May 22, 2024

cc/ecf: Counsel of record